THEODORE BERDELL *et al.*, Respondents and Appellants, *v.* HARRY ALLEN *et al.*, Appellants and Respondents.

*Court of Appeals, November 26, 1889.*

Affirming 3 N. Y. St. Rep. 523.

1. *Contract. Construction.*—Where defendants agreed to sell plaintiffs' stock, and, after deducting all expenses and commissions, to divide the profits, and thereupon contracted with an agent to go to England to attend to such sale, for one half of their interest and profits, who employed a broker to make the sale, the compensation to the agent is not, but the commissions to the broker are, expenses within the meaning of the contract.

2. *Appeal. Reviewable.*—Findings of fact, made by the trial judge upon conflicting testimony and supported by evidence, and confirmed by the general term, are not open to review in the Court of Appeals, but must be accepted as final for the purposes of the appeal.

3. *Same. Presumption.*—Where the trial is before the court without a jury, it will be presumed, in support of the judgment, that such additional facts were found and considered, though not written out in the formal decision, as, having the support of sufficient evidence appearing in the record, tend to sustain the findings formally made.

This action was brought to set aside an agreement stating and settling certain accounts between the parties on the ground of fraud, and for a restatement of such accounts.

The trial court found the fraud as alleged, set aside the agreement and directed a restatement of the account upon certain principles stated.

Cross-appeals were taken from the judgment of the general term of the superior court of the city of New York, which modified and affirmed, as modified, a final judgment, entered upon the report of a referee, and an interlocutory judgment, entered upon the decision of the court.

*Edward M. Shepard*, for plaintiffs.

*James L. Bishop*, for defendants.

VANN, J.—The main object of these appeals is to determine the proper basis for the division of the so-called "profits" between the parties. The plaintiffs claim that neither the amount retained by Reynolds, nor the sum paid to Abbott should be deducted before such division is made, while the defendants contend that the "profits" are the residue after deducting both of those sums. The courts have thus far sustained the position of neither party, but have included the sum going to Reynolds, and excluded the sum going to Abbott, before making a division. The question involves a construction of the contract, as amended on two occasions, aided, in so far as the meaning is doubtful, by a view of the surrounding circumstances, including the facts known to both parties when it was executed.

By the original contract of October 3d, 1881, the defendants specifically agreed to act as agents for the sale of the shares of stock in question, to use their best efforts to place the same and to bear all of the expenses incidental thereto. The earlier provision relating to "a call" suggests the relation of vendor and vendee, but there could not be both a sale and an agency, because, if the defendants bought the

property of the plaintiffs, they could not act as agents of the plaintiffs for the sale of property which belonged to themselves. If there was a sale there could not be an agency, and if there was an agency there could not be a sale. We think that the contract, considered as a whole, was one of agency only, and that the part relating to a call was simply for the protection and security of the defendants, to enable them to receive the compensation agreed upon, which was a share of the "profits," as they were termed, to be realized upon a sale for more than the arbitrary sum named as going to the plaintiffs. Whatever the legal relation of the parties may have been, however, the defendants were bound to divide equally with the plaintiffs " the net proceeds received over and above five dollars per share from the amount of money actually received by " them.

The amendment of November 19 throws no light upon the method of dividing the profits, but by a further amend ment on March 9 all expenses and commissions were to be deducted, and there was to be an equal division of the profits accruing to the defendants personally. The substantial part of the controversy turns on the meaning of the word " personally," as thus used. The defendants now insist that it excludes the entire sum retained by Reynolds, amounting to over $100,000, although this position is not suggested in their answer. The name of Reynolds does not appear in any of the contracts between the parties. He was not the agent of the plaintiffs, nor the agent of the parties jointly, but was the assignee of one-half of defendants' share in the profits, which he was to earn by doing that which the defendants had agreed to do. He thus became their substitute or agent. In their answer and in a sworn account produced upon the trial, they speak of him as their agent, and in their letters to him they call him their confidential agent and request him not to furnish information to the plaintiffs in regard to this business.

Hence, whatever came to him came to the defendants, so far as the plaintiffs are concerned.

Moreover, it is to be observed that the expression in question is used in connection with the statement that the profits to be divided consist of the difference between the price of five dollars per share and the average price at which all the shares shall be sold. Was it not this difference which accrued to the defendants personally, and could they deprive the plaintiffs of any portion of it by assigning a part of their part to Reynolds ? As suggested by the learned trial judge, was it competent for them to entrust to a substitute the work which they undertook to do, and yet claim both the amount paid to him and the whole interest secured to themselves ? Could they use their agency for their personal benefit at the expense of their principals ? The last clause of the contract of March 9 provides that the average sales mean the average price received, indicating that the defendants were not to be liable for the amount of sales, but for the amount paid, or the money received by them personally. What came to their agent in a legal sense came to them personally ; that is, it came under their personal control. It did not accrue to them personally any the less because they assigned a share to their agent. It accrued to them before they could pay it to him.

The expression used in the contract of October 3 is " the amount of money actually received," while in one part of the agreement of March 9 it is " the profits received," and in another part of the same instrument, " the profits which may accrue * * * personally." Considering the context, and all the circumstances under which the words are used, there does not seem to be any material difference in the meaning of the three forms of expression. This was apparently the understanding of the defendants themselves, not only when the sales were made and the proceeds thereof received, but even until a comparatively recent period.

As the findings of fact made by the trial judge were sup-

ported by evidence, and have been confirmed by the general term, they are not open to review in this court, but must be accepted as final for the purpose of this appeal. Code Civ. Pro., § 1337; In the Matter of Ross, 87 N. Y. 514. Furthermore, as the trial was before the court without a jury, it will be presumed, in support of the judgment, that such additional facts were found and considered, although not written out in the formal decision, as, having the support of sufficient evidence appearing in the record, tend to sustain the findings formally made. Armstrong *v.* Du Bois, 90 N. Y. 95; Meyer *v.* Lathrop, 73 Id. 315, 321; Hays *v.* Miller, 70 Id. 112, 116; Sheldon *v.* Sherman, 42 Id. 484, 489. This presumption is of some importance in view of the question now under consideration.

The defendants testified that before the contract of March 9 was executed, they proposed to the plaintiffs that the Reynolds deductions should be charged as an expense of the business; that the plaintiffs assented to the proposition, and that the contract was drawn accordingly. The plaintiffs denied this, and there was evidence tending to corroborate the denial, some of which appeared in certain letters written by the defendants to Reynolds. The plaintiffs also testified that while they knew that the defendants had made some arrangement with Reynolds by which they were to divide some of their profits with him, yet they knew nothing about the details, and did not know what share he was to have. If the plaintiffs assented to said proposal, or even if they knew the share that Reynolds was to have in the profits, the defendants claim that the fact has an important bearing in determining the meaning of the expression relating to a division of the profits accruing to Allen and Stead personally, and that it indirectly refers to Reynolds by way of distinction or exclusion.

The trial court found that the settlement between the parties was fraudulent because the defendants represented that the total sales for which they had accounts amounted

to $756,787.50, instead of $890,930.19, as was the fact.   As
the difference was in substance simply the amount of the
Reynolds deductions, it is to be presumed, upon applying
the principle already mentioned, that the court found for
the plaintiffs upon the question of fact above pointed out.
It follows that the contract is to be construed in the light
of plaintiff's ignorance, not their knowledge, of Reynolds'
share in the profits.   It is not probable that they understood
the contract to include, as part of the expenses, an amount
unknown to themselves, but which they knew was known
to the defendants.   But what did the defendants under-
stand the contract to mean, as shown by the practical con-
struction of it while the business was going on, and before
the day of settlement?   In a letter to Reynolds, dated
May 17, 1882, they said:  " Inasmuch as 5,250 pounds is due
Berdell and Witherell on the original contract, being one-
half of the profits, we suppose you must have considered
that a settlement should not be made with Berdell and
Witherell until the final closing of the accounts.   The fact,
nevertheless, is that the only moneys to which you are en-
titled are one-quarter of the profits, to wit, 2,625 pounds, a
like amount being due us, and the balance we are account-
able for to Berdell and Witherell.   *   *   *   Cable our
one-half of your and our joint profits, to wit, 2,625 pounds.
We are obliged to settle with Berdell at once for his half
profits under agreement."

Under date of June 1, 1882, they wrote him as follows:
" The amount that Berdell and Witherell would have been
entitled to would have been half of the difference between
21 shillings and 32s. 6d. on 40,000 shares ; or in other words,
they would have been entitled to 5s. 9d. per share, leaving
5s. 9d. per share to be divided between you and ourselves."

On the 30th of January, 1883, referring to some of their
own stock that Reynolds was selling under the same agree-
ment, they said:  " You would be entitled to one-half
the difference on the 20,000 shares," but in the same letter,

referring to the stock of the plaintiffs, they added : " And in respect to all the other shares, you would be entitled to one-quarter of the difference."

According to these letters, the defendants understood the contract precisely as the plaintiffs did, so far as the Reynolds deduction is concerned, and as the courts have thus far construed it.   They do not appear to have openly interpreted it in any other way, even on the occasion of the settlement, when they prepared a statement showing the amount of the sales to have been much larger than they represented to the plaintiffs, and which contained the Reynolds deduction. But instead of showing that statement to the plaintiffs they gave them one in which no such deduction appeared.   The suppression of the former statement, however, is no more significant than the fact that the latter, which was the basis of the settlement, showed an over-payment to the plaintiffs of some thousands of dollars, provided the construction now contended for by the defendants is correct.   It is also significant that they never mentioned to Reynolds any such change in the contract as they now claim was made.

We do not think that the parties intended by their arrangement of March 9 to make any change in respect to the compensation of the defendants for selling the stock as the agents of the plaintiffs, except to authorize the deduction of all expenses and commissions.   Reynolds was not a broker, and he sold none of the stock to speak of.   His compensation was not an expense, any more than that of the defendants themselves.   From what has been said it is obvious that he was not entitled to commissions.   His relations to the parties and to the agreement between them, as well as his compensation, did not rest upon a brokerage contract.   On the other hand, Abbott was a broker and sold substantially all of the stock, and may be said to have received an interest in lieu of brokerage.   The term commissions, therefore, would be properly applicable to him.   As said by the learned general term : " Whether there was a sale of the stock to Abbott, or whether Abbott was paid a

commission of one-half the amount realized over the price fixed in the agreement with him, is not material. In neither case would defendants be chargeable with the amount paid to him."

If this reasoning is sound, it disposes of the chief ground of contention upon either side and sustains the action of the lower courts, leaving for consideration a few details of the account as stated by the referee, that are challenged by the defendants.

We think that the allowance to them of $1,109, for the expenses of Mr. Allen in Europe, and of 34.50 for cablegrams, was properly made by the general term for the reasons stated in its opinion.

After a careful examination of the other items, we think that they were correctly disposed of by the referee, and that the judgment should be affirmed, but as both parties appealed, without costs in this court to either.

All concur.